UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
FRANCESCO ZANGHI and ZANGHI LLC,

             Plaintiffs,              **MEMORANDUM AND ORDER**

      - against –

PIERGRAZIANO RITELLA, GIUSEPPE        19 Civ. 5830 (NRB)
CAVALLARO, ALESSANDRO VACCA, GIANLUCA
ALOCCI, STEFANO CALLEGARI, FUTURA
HOSPITALITY LLC, STUDIO LEGALE
CAVALLARO, and GIOIA E VITA S.R.L.,

             Defendants.
------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     This case arises out of investments made by plaintiffs
Francesco Zanghi and his company, Zanghi LLC, in pizzerias
located in the United States and Italy.  Broadly speaking,
the Amended Complaint ("Complaint" or "FAC" (ECF No. 87))
alleges that Zanghi, an Italian citizen and domiciliary, was
induced into making those investments as a result of
misrepresentations and other misconduct by fellow Italian
domiciliary defendants Giuseppe Cavallaro, Alessandro Vacca,
Gianluca Alocci, Stefano Callegari, Studio Legal Cavallaro,
and Gioia e Vita S.r.l. as well as U.S. defendants Piergaziano
Ritella and Futura Hospitality LLC.

     The ten-count Complaint asserts claims for the unlawful
sale of unregistered securities and fraud in connection with

the purchase of securities in violation of Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  15 U.S.C. §§ 77*l*(a)(1), (2), 78j(b), 78t(a); 17 C.F.R. § 240.10b-5.  The Complaint also charges defendants with civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") for engaging and conspiring to engage in a pattern of racketeering activity.  18 U.S.C. §§ 1962(c), (d).  Finally, the Complaint asserts common-law claims for fraud, breach of fiduciary duty, conversion, money had and received, and unjust enrichment.

Defendants move to dismiss the Complaint on several grounds.  ("Mot." (ECF No. 139).)  First, they seek dismissal of the case in its entirety on the grounds of forum non conveniens.  Second, defendants argue that the Complaint fails to adequately plead a strong inference of scienter to support the Section 10(b) and Rule 10b-5 securities fraud claims.  Third, defendants offer various arguments for dismissal of plaintiffs' civil RICO claims, including that the Private Securities Litigation Reform Act ("PSLRA") bars civil RICO claims predicated on conduct that would qualify as securities fraud.  See 18 U.S.C. § 1964(c).  Finally, defendants submit that the Court should decline to exercise

supplemental jurisdiction over plaintiffs' common law claims on the basis that plaintiffs have failed to plead viable claims arising under federal law.  For the reasons below, defendants' motion is granted in part and denied in part.

### BACKGROUND[1]

In 2014, Zanghi sustained serious injuries in a boating incident.  Following the incident, Zanghi hired defendant Cavallaro, an Italian attorney and Zanghi's close friend, and Cavallaro's law firm, defendant SL Cavallaro, and obtained a €420,000 settlement for his injuries.

Roughly four years later, in May 2018, Cavallaro approached Zanghi about an opportunity to invest in a Roman-style pizzeria brand called La Rossa that was opening restaurants in the United States and potentially other locations internationally.  Cavallaro explained to Zanghi that the La Rossa brand had been founded by defendant Ritella, a restaurateur living in New York, and that the La Rossa pizzerias were going to use a proprietary pizza-making method developed by defendant Callegari, an Italian chef, based on a 200-year-old sourdough starter.  Cavallaro helped Ritella plan and develop the La Rossa projects in the United States, which included drafting the purchase agreement for

---

[1] The following is a summary of the facts alleged in the Complaint, which we accept as true for purposes of defendants' motion to dismiss.

Callegari's proprietary pizza-making method and handling La Rossa's trademark application.  During the May 2018 meeting, Cavallaro introduced Zanghi to Ritella as a potential investor in La Rossa.

Following the meeting, Cavallaro sent Zanghi the La Rossa business plan that had been drafted by Cavallaro, SL Cavallaro, and Ritella.  After reviewing the business plan, Zanghi purchased membership interests in three La Rossa limited liability companies from defendant Futura, Ritella's holding company for ownership interests in various La Rossa entities.  Specifically, between June and November 2018, plaintiffs acquired the La Rossa membership interests through the following transactions:

> (1) a $70,000 transaction in June 2018 for 15% of the La Rossa brand;
>
> (2) a $100,000 transaction in June 2018 for 33% of La Rossa's Miami location ("La Rossa Miami");
>
> (3) an $85,000 transaction in August 2018 for 10% of La Rossa's New York location ("La Rossa New York"); and
>
> (4) a $60,000 transaction in November 2018 for an additional 20% of La Rossa New York and an investment towards acquiring 22% of a Miami-based restaurant called Giotto that would also employ La Rossa's proprietary pizza-making method.[2]

---

[2]     We note that while the Complaint alleges that this was a $60,000 transaction (FAC ¶¶ 219-30), the contract filed with the Court only shows a purchase of 20% of La Rossa New York for $50,000 (ECF No. 146-5).  Likewise, the Complaint alleges that Zanghi invested more than $190,000 in La Rossa New York (FAC ¶¶ 107, 194), even though the two transactions related to La Rossa New York described in the Complaint amount to less than $145,000 (see id. ¶¶ 181, 219, 227; see also ECF Nos.

The limited liability company interests that Zanghi acquired were only partial ownership interests with no managerial authority.   Ritella and Futura remained the managing members with the exclusive right to manage, control, and conduct the business of the La Rossa brand, La Rossa Miami, and La Rossa New York.   Zanghi completed these transactions through Zanghi LLC, a limited liability company owned entirely by Zanghi and originally organized by Ritella. Cavallaro, SL Cavallaro, and defendant Alocci, Cavallaro's associate, drafted the Zanghi LLC-Futura purchase agreements and reviewed them with Zanghi.   Upon completion of these transactions, Cavallaro demanded and received $15,000 in commissions from Futura for his role in securing Zanghi's investments.

While La Rossa's New York location opened in December 2018, it folded within a year when New York City marshals seized the property for the restaurant's failure to pay rent. The La Rossa Miami location never opened, and defendants never acquired Giotto.

The Complaint alleges that each of the La Rossa transactions was tainted by fraud.   Among other misrepresentations and acts of misconduct pled in the

---

146-4, 146-5).  These disparities have not been addressed or resolved by the parties but ultimately have no bearing on this motion.

Complaint related to these transactions, plaintiffs allege that:

> (1) the La Rossa business plan contained misstatements about the amount of the total investment in the La Rossa entities and how those funds were being employed;

> (2) La Rossa's proprietary pizza-making method was based on Callegari's sourdough starter that was illegally smuggled into the United States,[3] a fact that Zanghi claims was never disclosed in the La Rossa business plan or otherwise;

> (3) information about La Rossa New York's tax and rent liabilities as well as title issues with the La Rossa membership interests sold by Futura were concealed from Zanghi; and

> (4) Ritella and defendant Vacca, another Italian restaurateur, forged a purchase agreement that was presented to Zanghi and purported to show equipment purchases by La Rossa Miami that never occurred.

Separate from the La Rossa transactions, Zanghi also claims to have been defrauded into purchasing a 24% ownership interest in Callegari's restaurant, Sforno, located in Rome. Zanghi purchased the ownership stake in Sforno from the Italian restaurateur Vacca's company, defendant Gioia e Vita, for €72,000.   The Complaint alleges that Vacca, Ritella,

---

[3]     Plaintiffs' brief claims that importing the sourdough starter from Italy into the United States violated the criminal anti-smuggling provisions set forth in 18 U.S.C. § 545; the Public Health Security and Bioterrorism Preparedness and Response Act of 2002, 21 U.S.C. § 350d ("Bioterrorism Act"); and——inexplicably——the U.S. Customs and Border Protection regulations requiring written declarations for unaccompanied articles of a person "arriving directly or indirectly from American Samoa, Guam, the Commonwealth of the Northern Mariana Islands, or the Virgin Islands of the United States," 19 C.F.R. § 148.111.  (See Pls.' Opp. Br. (ECF No. 143) at 24.)

Cavallaro, and Alocci made material misrepresentations to Zanghi to induce his investment in Sforno.

The Complaint also alleges that defendants operated as a RICO enterprise to carry out these fraudulent acts as part of an "overarching scheme of preparing and disseminating forged and false documents to defraud Zanghi" and "profit[ing] from the fraudulent recruitment of investors in Roman-styled pizzerias." (FAC ¶¶ 269, 296.) In support of their civil RICO claim, plaintiffs allege that defendants committed multiple predicate acts of wire fraud in violation of 18 U.S.C. § 1343 in connection with making material misrepresentations to Zanghi for the purpose of inducing his investments in the La Rossa entities. (See id. ¶¶ 261-92.) As additional predicate acts in furtherance of the RICO enterprise, the Complaint also alleges that defendants engaged in bank fraud, money laundering, the receipt and transfer of stolen property, immigration document fraud, grand larceny, the use of means of interstate and foreign travel to carry out racketeering acts, and witness tampering in connection with this lawsuit in violation of 18 U.S.C. §§ 1344, 1512, 1546, 1952, 1956, 1957, 2314, and 2315 as well as New York Penal Law § 155.40. (See id.)

**DISCUSSION**

**I.     Forum Non Conveniens**

We begin with defendants' argument that we should exercise our discretion under the doctrine of <u>forum non conveniens</u> to dismiss this case without prejudice so that it may instead be litigated in Italy.[4]

While the Complaint does not distinguish between claims related to the La Rossa transactions and claims related to the Sforno transaction when pleading the causes of action, these transactions arose from distinct sets of contracts concerning different groups of restaurants that plaintiffs allegedly entered into based on separate instances of misrepresentations and other misconduct.   Given these distinctions, we analyze the La Rossa claims and the Sforno claims separately for purposes of the <u>forum non conveniens</u> discussion below.

---

[4]     While defendants purport to present this argument as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), which concerns the Court's personal jurisdiction over the defendants, or as a motion to dismiss for improper venue, which would arise under Rule 12(b)(3), defendants offer no substantive arguments in their brief to support dismissal on these grounds.   Rather, based on the substance of the arguments presented in the briefing, we understand defendants to be moving for dismissal under the doctrine of <u>forum non conveniens</u>, which invokes the Court's inherent authority and does not arise under Rule 12.   <u>See Monegasque de Reassurances S.A.M. (Monde Re) v. Nak Naftogaz of Ukraine</u>, 158 F. Supp. 2d 377, 379 n.3 (S.D.N.Y. 2001), <u>aff'd sub nom. In re Arb. between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine</u>, 311 F.3d 488 (2d Cir. 2002) (citing <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 44 (1991)).   Accordingly, the Court will treat this aspect of defendants' argument solely as a <u>forum non conveniens</u> motion.

### A.   Legal Standards

Forum non conveniens is a discretionary doctrine that permits a district court to dismiss claims when "a court abroad is the more appropriate and convenient forum for adjudicating the controversy." Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 425 (2007); see Carey v. Bayerische Hypo-Und Vereinsbank AG, 370 F.3d 234, 237 (2d Cir. 2004) (noting that forum non conveniens is a "discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim.") (citation omitted); Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001) (en banc) (describing the decision to grant a motion to dismiss for forum non conveniens as lying "wholly within the broad discretion of the district court") (citation omitted).

Typically, when presented with a motion to dismiss for forum non conveniens, a court must assess: "(1) the deference to be accorded the plaintiff's choice of forum; (2) the adequacy of the alternative forum proposed by the defendants; and (3) the balance between the private and public interests implicated in the choice of forum." Fasano v. Yu, 921 F.3d 333, 335 (2d Cir. 2019) (citation omitted) ("Fasano I"). The moving party has the burden of establishing that an adequate alternative forum exists and that the balance of the public

and private interest considerations in favor of litigating claims in the alternative forum heavily outweighs the deference afforded to the plaintiff's forum choice.  See Abdullahi v. Pfizer, Inc., 562 F.3d 163, 189 (2d Cir. 2009).

However, the forum non conveniens analysis is substantially modified when the parties previously agreed to a contractual forum selection clause governing the claims in dispute.  See Fasano I, 921 F.3d at 335.  A forum selection clause is presumptively enforceable when: "(1) the clause was reasonably communicated to the party resisting its enforcement; (2) the clause is mandatory . . .; and (3) the claims and parties to the dispute are subject to the clause." Id. (citation omitted).

If these conditions are met, then the forum selection clause should be enforced unless the party resisting enforcement can make a sufficiently strong showing that: "(1) [the forum selection clause's] incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum state; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court."  Phillips v. Audio Active Ltd., 494 F.3d 378, 383-84, 392 (2d Cir. 2007) (citations omitted).

When conducting the <u>forum non conveniens</u> analysis, courts accept the factual allegations pleaded in the complaint as true and draw reasonable inferences in favor of the non-moving party; courts may also consider affidavits submitted by the parties as well as documents that are attached to the complaint or incorporated by reference.  <u>See</u> <u>Accent Delight Int'l Ltd. v. Sotheby's</u>, 394 F. Supp. 3d 399, 406 n.1 (S.D.N.Y. 2019) (citations omitted).

**B.   The La Rossa Claims**

There are four contracts governing the La Rossa transactions at issue (the "La Rossa Contracts," ECF Nos. 146-2, 146-3, 146-4, and 146-5).  Each La Rossa Contract contains a forum selection clause and thus our analysis starts there.

**1.   The La Rossa Forum Selection Clauses**

In relevant part, the La Rossa Contracts provide:

> This Agreement shall be construed in accordance with the laws of the State of New York without giving effect to principles of conflict of laws.  All parties consent to the exclusive jurisdiction of all state and federal courts of record situated in the County of New York of the State of New York.

(ECF No. 146-2 § 7.3; ECF No. 146-3 § 7.3; ECF No. 146-4 § 9.3; 146-5 § 7.3.)  Defendants do not dispute that the clauses in the La Rossa Contracts were reasonably communicated, that

the language mandates exclusive jurisdiction in New York
state and federal courts, or that the clauses are sufficiently
broad to cover plaintiffs' claims related to the La Rossa
transactions. Instead, defendants' sole argument is that the
clauses are only enforceable against Futura, the entity that
signed the La Rossa Contracts, and Ritella, the individual
that controls Futura and signed the Contracts on behalf of
Futura, and are thus not binding on the other defendants who
are not party to those agreements.

### 2. Enforceability of the Clauses Against the Non-Signatory Defendants

It is well settled that "the fact [that] a party is a
non-signatory to an agreement is insufficient, standing
alone, to preclude enforcement of a forum selection clause."
Aguas Lenders Recovery Grp. v. Suez, S.A., 585 F.3d 696, 701
(2d Cir. 2009). As relevant here, a forum selection clause
may be enforced against a non-signatory to a contract under
New York law when the non-signatory is sufficiently "closely
related" to a contracting party or the dispute arising from
the transaction that it is foreseeable that it will be bound
by the forum selection clause. See Prospect Funding Holdings,
LLC v. Vinson, 256 F. Supp. 3d 318, 324 (S.D.N.Y. 2017)
(listing cases).

While the foreseeability standard "implies that the non-signatory must have been . . . involved in the transaction in some manner," Recurrent Capital Bridge Fund I, LLC v. ISR Systems and Sensors Corp., 875 F. Supp. 2d 297, 306 (S.D.N.Y. June 25, 2012), there is no requirement that the non-signatory be aware of the specific terms of the agreement or the existence of the forum selection clause, see Diamond v. Calaway, No. 18 Civ. 3238 (KPF), 2018 WL 4906256, at *5 (S.D.N.Y. Oct. 9, 2018) (citation omitted).

Courts in this Circuit have generally found that a sufficiently close relationship arises in two situations: (1) "where the non-signatory had an active role in the company that was the signatory," or (2) "where the non-signatory had an active role in the transaction between the signatories." Prospect Funding Holdings, 256 F. Supp. 3d at 325 (citation omitted). Thus, even if a non-signatory is not formally affiliated with a contracting party, courts have held that they it may be bound by a forum selection clause under the "close relationship" test when it "act[s] in concert" with a signatory to harm the plaintiff in connection with the transaction. Weingard v. Telepathy, Inc., No. 05 Civ. 2024 (MBM), 2005 WL 2990645, at *6 (S.D.N.Y. Nov. 7, 2005).

### a.   Cavallaro and SL Cavallaro

We begin our analysis with Cavallaro and his law firm, SL Cavallaro.  The Complaint alleges that Cavallaro helped plan and develop the La Rossa projects in the United States, pitched Zanghi on the idea of investing in La Rossa, introduced Zanghi to Ritella as a potential investor, played a role in creating the allegedly misleading La Rossa business plan presented to Zanghi, drafted and helped execute the La Rossa Contracts, and demanded and received commissions from Futura for his role in securing Zanghi's investment in La Rossa.  (See FAC ¶¶ 37, 41-42, 45, 56-60, 62, 72, 86-88, 155-56, 172-73, 273, 277, 280.)  Cavallaro conducted many of these activities in his professional capacity at SL Cavallaro and, in that capacity, was clearly aware of the forum selection clauses in the La Rossa Contracts that he helped execute.

We find that these allegations present a sufficient factual basis to conclude that Cavallaro and, by extension, SL Cavallaro acted in concert with Futura to harm Zanghi in connection with the La Rossa transactions and thus both can be bound by the forum selection clauses.[5]

---

[5]    Citing to Leviton Mfg. Co. v. Reeve, 942 F. Supp. 2d 244 (E.D.N.Y. 2013), defendants argue that attorneys who are not signatories to a contract cannot be bound by a forum selection clause as a "closely related" party even when they are alleged to have engaged in misconduct related to the transaction.  Leviton, however, does not stand for such a broad proposition.  While the attorney in Leviton represented the co-defendants in a stock purchase transaction and allegedly sent an opinion letter to plaintiff that contained material misrepresentations in

### b.   Alocci

We  reach  the  opposite  conclusion  for  Cavallaro's
associate  Alocci.   While  the  Complaint  alleges  that  Alocci
worked  on  the  transactional  papers  for  La  Rossa's  acquisition
of  Callegari's  proprietary  pizza-making  method  and  helped
prepare  and  review  the  La  Rossa  Contracts  for  Zanghi  (id. ¶¶
37,  41,  164),  there  are  scant  factual  allegations  to  establish
that  Alocci  was  working  hand-in-hand  with  Futura  to  defraud
Zanghi.   Critically,  unlike  with  Cavallaro,  the  Complaint
does  not  allege  that  Alocci  played  a  direct  role  in  drafting
the  materially  misleading  statements  presented  to  Zanghi  in
connection  with  the  La  Rossa  transactions,  that  he  actively
recruited  Zanghi's  investments  in  La  Rossa,  or  that  he
received  any  commission  from  Futura  for  securing  those
investments.   Accordingly,  we  find  that  Alocci  was  not
sufficiently  related  to  Futura  or  the  fraud  underlying  the
transactions  to  be  bound  by  the  forum  selection  clauses.

---

connection with that transaction, see id. at 251-52, the court explicitly
noted that there were no allegations that the attorney "acted in concert"
with his clients "to induce the Plaintiff into entering into the Stock
Purchase Agreement."  Id. at 258-59.  Because we find that the Complaint
plausibly alleges that Cavallaro and SL Cavallaro did act in concert with
Futura to defraud Zanghi, Leviton is therefore distinguishable on its
facts as to those defendants.  We do, however, find Leviton instructive
as to the allegations concerning Alocci, discussed below.

### c. Vacca

Turning to Vacca, the Complaint alleges that he helped Ritella forge the La Rossa Miami equipment purchase agreement that was sent to Zanghi to fraudulently induce Zanghi's purchase of La Rossa membership interests from Futura. (Id. ¶¶ 139, 150, 153, 174, 274.)  We find that these allegations plausibly plead that Vacca acted in concert with Ritella and Futura to defraud Zanghi in connection with the La Rossa transactions and thus he shares a sufficiently close relationship to the signatories of the La Rossa Contracts to be subject to the forum selection clause.

### d. Gioia e Vita

While Vacca is the alleged legal representative of Gioia e Vita and caused Futura to wrongfully transfer some of plaintiffs' investment funds to Gioia e Vita, there is no allegation that Gioia e Vita played any direct role in fraudulently procuring plaintiffs' investments in La Rossa. Moreover, plaintiffs do not advance any argument that we should disregard Gioia e Vita's corporate form due to Vacca's actions.  Consequently, we find that Gioia e Vita is not bound by the forum selection clauses in the La Rossa contracts.

### e. Callegari

Finally, the Complaint does not allege that Callegari either has any connection to Futura beyond what appears to be

-16-

an arm's-length sale of his proprietary method to La Rossa. As the Complaint does not plead that Callegari had any involvement with Futura's transactions with Zanghi, the forum selection clauses in the La Rossa Contracts do not bind Callegari.

### 3.   Rebutting the Presumption of Enforceability

Defendants do not, and likely cannot, offer any compelling argument to rebut the presumption of enforceability based on fraud, overreaching, or public policy concerns.  See Phillips, 494 F.3d at 383-84, 392.  Thus, the New York forum selection clauses in the La Rossa Contracts are enforceable against Futura, Ritella, Cavallaro, SL Cavallaro, and Vacca.  However, because Italian domiciliaries Alocci, Gioia e Vita, and Callegari are not bound by those clauses, we proceed to analyze the traditional forum non conveniens factors below.

### 4.   Discussion of the Forum Non Conveniens Factors

#### a.   Deference to Plaintiffs' Forum Choice

We begin our analysis of the traditional forum non conveniens factors by determining how much deference should be afforded to plaintiffs' decision to sue in New York.  It is well established that "the degree of deference given to a plaintiff's forum choice varies with the circumstances" and that greater deference is given to a plaintiff's decision to

sue in his home forum whereas "[t]he choice of a United States forum by a foreign plaintiff is entitled to less deference." Iragorri, 274 F.3d at 71 (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 236 (1981)).  Additionally, greater deference is afforded to a plaintiff's choice of forum when it appears that the choice was guided by the plaintiff's or lawsuit's connection to the forum as opposed to forum shopping.  See id. at 71-72.

Here, with respect to home forum considerations, the main plaintiff in this action, Zanghi, is domiciled in Italy. Moreover, while Zanghi LLC is a New York limited liability company, its only member is Zanghi and it appears to have been created for the sole purpose of conducting Zanghi's business in the United States.  Accordingly, Zanghi LLC's connection to the United States provides no "bona fide reason for the plaintiffs to have sued in this Court" and would suggest that plaintiffs' "choice of this forum deserves little deference." RIGroup LLC v. Trefonisco Mgmt. Ltd., 949 F. Supp. 2d 546, 552 (S.D.N.Y. 2013), aff'd, 559 F. App'x 58 (2d Cir. 2014) (citation and internal quotation marks omitted); see Wave Studio, LLC v. Gen. Hotel Mgmt. Ltd., No. 13 Civ. 9239 (CS), 2017 WL 972117, at *6 (S.D.N.Y. Mar. 10, 2017), aff'd, 712 F. App'x 88 (2d Cir. 2018).

However, it appears that plaintiffs' decision to bring claims related to the La Rossa transactions in New York is guided by the fact that plaintiffs and five of the eight defendants are bound by the forum selection clauses in the La Rossa Contracts.  This is a significant consideration, as the clauses compel plaintiffs to bring their claims against those five defendants in New York.  While plaintiffs' decision to sue in New York absent the forum selection clauses would be entitled to relatively little deference, we find that the presence of the forum selection clauses dictate that plaintiffs' choice of forum is entitled to at least a moderate level of deference.

### b.   Adequate Alternative Forum

Next, we consider whether Italy is an adequate alternative forum.  This factor turns on whether "defendants are amenable to service of process [in Italy], and if [Italy] permits litigation of the subject matter of the dispute." Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003).

Defendants submit that they will submit to jurisdiction in Italy and will treat any case filed in Italy as if it were commenced on June 21, 2019——the date plaintiffs filed the original complaint in this action——for statute of limitations purposes.  (Mot. at 29.)  Moreover, defendants maintain that

Italian courts "permit[] suits involving the subject matter
in dispute," that "Zanghi's pleadings are recognized in
Italian courts," and that "enforcement of any judgment could
also be handled under Italian civil procedure." (Id.)  While
defendants fail to offer any affidavit or citation in support
of these assertions, plaintiffs do not even attempt to argue
that Italy is not an adequate alternative forum to hear their
claims.  Given that other courts have held that Italy is an
adequate alternative forum to litigate transactional fraud
claims, including those involving the purchase of securities,[6]
we will therefore accept defendants' uncontroverted argument
that Italy is an adequate alternative forum to adjudicate the
substance of plaintiffs' claims.

### c. Balancing Private and Public Interest Factors

Finally, we consider the private and public interest
factors.  The private interest factors measure a defendant's
inconvenience with litigating a case in the plaintiff's
selected forum against the hardships the plaintiff would
suffer as a result of dismissal and the obligation to bring
the suit in another country.  See Iragorri, 274 F. 3d at 73-
74.  Relevant considerations include: (1) the ease of access

---

[6]    See, e.g., Fabian v. LeMahieu, No. 19 Civ. 54, 2020 WL
3402800, at *8-9 (N.D. Cal. June 19, 2020) (involving securities fraud
claims) (listing cases).

to evidence; (2) the cost for witnesses to attend trial;
(3) the availability of compulsory process; and (4) and other
factors that might shorten the trial or make it less
expensive.  Piper Aircraft, 454 U.S. at 241 n.6.

Public interest factors, on the other hand, concern the
burdens involved in the orderly administration of the case
and relevant considerations include: (1) the interest in
having local disputes settled locally; (2) the interest in
avoiding problems associated with the application of foreign
law; and (3) the interest in avoiding burdening jurors with
cases that do not affect their community.  Alfadda v. Fenn,
159 F.3d 41, 46 (2d Cir. 1998).

Here, relevant evidence and witnesses are likely to be
located in both the United States and Italy.  Moreover, while
most of the individuals involved in the La Rossa transactions
reside in Italy, the La Rossa Contracts were executed in the
United States and the subject of those Contracts were
restaurants located in the United States.  Additionally,
given the nature of plaintiffs' claims and the choice-of-law
provisions in the La Rossa Contracts, it appears that New
York law and federal law will govern plaintiffs' claims
related to the La Rossa transactions.  Finally, as noted
above, we find it particularly salient that plaintiffs and
five of the eight defendants are subject to a forum selection

clause compelling litigating in this forum.   While we recognize that the remaining defendants will face some expense in having to defend themselves in New York, defendants have not carried their burden to establish that those considerations substantially outweigh the deference afforded to plaintiffs' decision to sue in this forum.   Accordingly, we reject defendants' motion to dismiss the claims related to the La Rossa transactions on _forum non conveniens_ grounds.[7]

### C.   The Sforno Claims

We next consider whether it is appropriate to dismiss claims related to the Zanghi's purchase of a 24% stake in the Roman restaurant Sforno from Gioia e Vita.   The Sforno contract contains a forum selection clause that designates Rome, Italy as a forum for the parties' disputes related to the transaction and thus our analysis begins there.   However, in a reversal of roles, it is now Zanghi who is resisting enforcement of the forum selection clause.

### 1.   The Sforno Forum Selection Clause

Zanghi's lone argument for avoiding application of the forum selection clause in the Sforno contract is that it permissive rather than mandatory.   In other words, Zanghi

---

[7]      We likewise will exercise our discretion to retain jurisdiction over plaintiffs' related breach of fiduciary duty claim against Ritella arising out of the duties he owes as organizer of Zanghi LLC, which are governed by New York limited liability company law.

argues that the clause does not _require_ that disputes related to the Sforno transaction be brought exclusively in Rome.

The parties have submitted competing English translations of the forum selection clause in the Sforno contract, which was originally written in Italian. According to the certified translation furnished by defendants, the forum selection clause provides:

> Any dispute that may arise concerning this contract or its execution shall fall under the ROME Court jurisdiction after civil and commercial mediation attempts.

(ECF No. 146-6.) The certified translation of the same clause provided by plaintiffs states:

> For any dispute arising in connection with this Agreement or its execution, the Court of ROME will have jurisdiction following an attempt of civil and commercial mediation.

(ECF No. 148-1.)

While both translations certainly suggest that the clause is mandatory, plaintiffs have submitted an expert affidavit from lawyer licensed to practice in Italy who opines that Italian courts have held that similarly worded clauses do not confer exclusive jurisdiction to the identified forum. (ECF No. 148-2.) Defendants have not submitted any authority

contradicting the opinion offered by plaintiffs' expert.[8]
Thus, despite what appears to be mandatory language, we will
assume, <u>arguendo</u>, that the clause is permissive and turn to
the traditional <u>forum non conveniens</u> analysis.

2.   **Discussion of the <u>Forum Non Conveniens</u> Factors**

First, with respect to the deference afforded to
Zanghi's forum choice, we find that Zanghi's decision to
litigate the Sforno claims in the United States is entitled
to little deference because he is an Italian domiciliary and
thus this forum is not his home jurisdiction.

Next, as established above, Italy is an adequate
alternative forum to litigate the substance of Zanghi's
claims.

---

[8]   Defendants argue that plaintiffs' expert's opinion should be
afforded no weight because it has not been established that Italian law
governs the interpretation of the Sforno contract, as the parties have
not relied on any distinctive features of Italian law when presenting
their arguments. (<u>See</u> ECF No. 149 at 1-2.) Thus, defendants urge us to
instead apply general contract law principles and federal precedent to
interpret the clause. (<u>Id.</u>) However, in their supplemental submission,
plaintiffs do rely on distinctive features of Italian law in support of
their arguments about the permissive nature of the clause. Moreover,
under both federal and New York choice-of-law principles, the
interpretation of a contract is governed by the law of the jurisdiction
that has the greatest interest in the litigation, which is the
jurisdiction where the "center of gravity" of the transaction is located.
<u>See</u> <u>Alderman v. Pan Am World Airways</u>, 169 F.3d 99, 103 (2d Cir. 1999)
(discussing New York's "center of gravity" test); <u>Starke v. Squaretrade,
Inc.</u>, No. 16 Civ. 7036, 2017 WL 3328236, at *4 n.5 (E.D.N.Y. Aug. 3,
2017), <u>aff'd</u>, 913 F.3d 279 (2d Cir. 2019) (noting that the federal common
law choice-of-law analysis is similar to New York's "center of gravity"
approach). Here, given that the Sforno contract was executed in Italy
and the subject of the contract is a restaurant in Italy, it cannot
credibly be disputed that Italy is the center of gravity of this
transaction. Accordingly, we agree with plaintiffs that Italian law
governs the interpretation of the contract.

Finally, the private and public interest factors weigh heavily in favor of dismissal so that the claims can be brought in Italy. All of the parties to the Sforno transaction are Italian and reside in Italy, the contract was executed in Italy,[9] the subject of the underlying deal is an ownership stake in a restaurant located in Italy, and the transaction involved Italian financial institutions. Thus, substantially all of the relevant evidence and witnesses are likely to located in Italy and Italian law will almost assuredly govern the relevant common law claims at issue. Italian courts will therefore have a far greater interest in adjudicating this dispute, and Italian courts will be in a far more advantageous position to oversee discovery and trial of Zanghi's claims. Additionally, while the La Rossa claims and Sforno claims have overlapping parties, the Complaint alleges entirely different instances of misconduct related to those transactions. As such, there will likely be divergent evidence and testimony related to the two sets of claims, which undercut the potential efficiencies of trying those claims together.

---

[9]     While Zanghi alleges that he was living in the United States at the time the Sforno contract was executed (FAC ¶ 33), the Sforno contract itself states that the parties executed it in Rome and that Zanghi's domicile at the time of the contract was in Rome (ECF No. 146-6 at 2, 5).

Accordingly, we hold that the <u>forum non conveniens</u> analysis strongly favors dismissal of the Sforno claims so that they may be litigated in Italy.[10]

**D.  Severance**

As detailed above, we arrive at divergent conclusions for the La Rossa claims and the Sforno claims based on our <u>forum non conveniens</u> analysis.

In <u>Phillips</u>, the Second Circuit determined that it would be appropriate to dismiss a plaintiff's contract claim and to retain jurisdiction over his remaining claims when a forum selection clause required a contract claim to be litigated in England and the <u>forum non conveniens</u> analysis for the other claims weighed in favor of deferring to plaintiff's decision to sue in the United States.  494 F.3d at 393.  The Second Circuit reasoned that the decision to dismiss one claim for <u>forum non conveniens</u> and retain jurisdiction over the others was compelled by its "twin commitments to upholding forum selection clauses where these are found to apply and deferring to a plaintiff's proper choice of forum," even if it could lead to "fractured litigation."  <u>Id.</u>  While the circumstances here are not perfectly analogous because the <u>forum non</u>

---

[10]    We also note that plaintiffs' breach of fiduciary duty claims against Cavallaro, Alocci, and SL Cavallaro implicate duties owed by Italian lawyers to their clients.  Accordingly, Italy is also the most appropriate forum to resolve those claims.

_conveniens_ factors weigh against deferring to Zanghi's decision to litigate the Sforno claims in the United States, we see no reason why the _Phillips_ reasoning should not apply with equal force.[11]

Accordingly, we will likewise exercise our discretion to retain jurisdiction over the La Rossa claims and the related New York limited liability company fiduciary duty claims and dismiss the Sforno claims and the Italian lawyer fiduciary duty claims without prejudice.[12]

---

[11] While _Phillips_ did not specify the mechanism for dismissing one claim under the doctrine of _forum non conveniens_ while retaining jurisdiction over the others, other courts in this District have accomplished this by severing the claims under Federal Rule of Civil Procedure 21. _See_ Wave Studio, 2017 WL 972117, at *10; _Erausquin v. Notz, Stucki Management (Bermuda) Ltd._, 806 F. Supp. 2d 712, 723-24 (S.D.N.Y. 2011); _see also_ Rudersdal v. Harris, No. 18 Civ. 11072 (GHW) (RWL), 2021 WL 2209042, at *21-28 (S.D.N.Y. Feb. 27, 2021) (listing cases and recommending severance of claims under Rule 21 to facilitate dismissal under _forum non conveniens_).

Rule 21 permits courts, "[o]n motion or on its own," to "sever any claim against any party." Fed. R. Civ. P. 21. Severance under Rule 21 is a discretionary doctrine and is guided by several factors, including whether: (1) the claims arise out of the same transaction or occurrence; (2) the claims present common questions of law or fact; (3) settlement of the claims or judicial economy would be facilitated; (4) prejudice would be avoided if the claims are severed, and (5) whether different witnesses and documentary proof are required for the separate claims. _Wave Studio_, 2017 WL 972117, at *9-10 (citations omitted). Severance "requires the presence of only one of these conditions." _Id._ at *10 (citation omitted). Here, as discussed above, the La Rossa and Sforno claims arise out of different transactions, will likely involve different evidence, and will likely be governed by the laws of different jurisdictions. Thus, we find that severance of the claims is warranted.

[12] Our dismissal of these claims is contingent on defendants submitting a stipulation within 30 days of this Memorandum and Order providing that they will: (1) submit to jurisdiction of the courts of Rome, Italy for claims relating to the Sforno transaction; and (2) agree, for purposes of waiving potential statute of limitations defenses, to treat any claims arising out of the Sforno transaction that plaintiffs may file in Italy as if they were filed on June 21, 2019, the date this action was commenced.

## II.  **Securities Fraud Claims**

We next consider plaintiffs' securities fraud claims, which are premised on allegations that Ritella, Cavallaro, SL Cavallaro, Vacca, and Alocci made material misstatements and omissions to induce plaintiffs' purchase of the La Rossa membership interests from Futura.  Defendants argue that plaintiffs' Section 10(b) and Rule 10b-5 claims[13] should be dismissed for failure to adequately allege a strong inference of scienter.[14]

In presenting their arguments, defendants do not analyze each alleged misrepresentation or its connection to the defendant allegedly involved in making that misrepresentation.  Rather, in briefing their securities fraud arguments, defendants have opted to take a more generic approach by broadly arguing that the Complaint fails to allege that defendants engaged in intentional or reckless behavior or that defendants had the motive to commit fraud without

---

[13]    Defendants do not present any argument for dismissal of plaintiffs' claims arising under Section 20(a) of the Exchange Act or Sections 12(a)(1) or 12(a)(2) of the Securities Act.

[14]    In a single sentence, defendants state the legal proposition that Rule 9(b) and the PSLRA require the circumstances of the fraud to be stated with particularity.  (Mot. at 23.)  Defendants, however, have not articulated any argument in briefing the securities fraud claims about why the allegations in the Complaint would fail to meet that standard. Accordingly, we focus on the arguments they raise about scienter.  In any event, with respect to the allegations of fraud that we sustain below, we find that the Complaint sets forth sufficient factual details to satisfy Rule 9(b) and the PSLRA.

tethering it to any specific representation (save for one illustrative example).  However, the Complaint need only allege a defendant's scienter for one misrepresentation attributed to that defendant for the securities fraud claims against that defendant to survive dismissal.[15]  As discussed below, we find that plaintiffs meet that standard for at least one misrepresentation attributable to Cavallaro, SL Cavallaro, and Ritella, but not for Alocci or Vacca.

### A.  Legal Standards

As relevant to plaintiffs' claims, Section 10(b) and Rule 10b-5(b) prohibit the use of material misstatements or omissions in connection with the purchase or sale of securities.  See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b).  The PSLRA requires complaints that plead a violation of these provisions to "state with particularity facts giving rise to a strong inference that the defendant acted with the

---

[15]    As defendants have not done the work to evaluate why the allegations for each of the misrepresentations are supposedly deficient, we will not attempt to divine what specific scienter arguments each defendant might have raised.  See Vantone Grp. Liab. Co. v. Yangpu NGT Indus. Co., No. 13 Civ. 7639 (LTS) (MHD), 2015 WL 4040882, at *7 (S.D.N.Y. July 2, 2015) (noting that "it is not the role of th[e] Court to divine . . . arguments on behalf of the Moving Defendants" when they "fail to make either a legal or factual showing addressing the insufficiency of any of the causes of action asserted against" them).  Accordingly, our discussion below is limited to analyzing whether plaintiffs have alleged at least one example of a misrepresentation made by each of the relevant defendants with the requisite scienter.  The parties are cautioned not to draw any conclusions about the legal sufficiency of the alleged misrepresentations not addressed below.  If defendants wish to challenge the soundness of plaintiffs' securities fraud claims premised on statements not discussed below, they may do so at a later stage of this litigation.

required state of mind,"——that is, the defendant acted with either (1) the "intent to deceive, manipulate, or defraud," or (2) "recklessness." <u>Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford</u>, 794 F.3d 297, 305 (2d Cir. 2015) (citations omitted); <u>see</u> 15 U.S.C. § 78u-4(b)(2)(A).  The inference that the defendant acted with the requisite scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." <u>Set Cap. LLC v. Credit Suisse Grp. AG</u>, 996 F.3d 64, 78 (2d Cir. 2021) (citation and emphasis omitted).

Plaintiffs can establish a defendant's scienter by alleging facts that show either: (1) that the defendant had a motive and opportunity to commit the fraud; or (2) that there is strong circumstantial evidence of conscious misbehavior or recklessness. <u>ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009) (citations omitted).

Motive and opportunity can be established by showing that the defendant could realize concrete personal benefits by committing the fraud, had the means to defraud plaintiff to realize those benefits, and used those means.  <u>See</u> <u>Blanford</u>, 794 F.3d at 309 (citation omitted).

Conscious misbehavior can be demonstrated by pleading circumstantial evidence showing the defendant engaged in

deliberate and intentional misconduct.  See In re Weight Watchers Int'l Inc. Sec. Litig., 504 F. Supp. 3d 224, 258 (S.D.N.Y. 2020) (citations omitted).  And recklessness can be shown by pleading circumstantial evidence demonstrating that the defendant's actions were so "highly unreasonable and constituted an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Id. (citations and internal quotation marks omitted).  Allegations that suggest mere negligence cannot meet the PSLRA's scienter standard.  See S.E.C. v. Obus, 693 F.3d 276, 286 (2d Cir. 2012) ("Negligence is not a sufficiently culpable state of mind to support a section 10(b) civil violation.") (citation omitted).

While we accept the factual allegations in the Complaint as true and draw all reasonable inference in favor of plaintiffs, we need not accept the legal conclusions couched as allegations in the complaint.  Edwards v. Sequoia Fund, Inc., 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted). Moreover, for any allegations made on information and belief, the complaint must state with particularity all facts upon which that belief is formed.  ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing 15 U.S.C. § 78u-4(b)(1)).

##### B.    Ritella

Starting with Ritella, the Complaint alleges that in the course of soliciting Zanghi's investment in La Rossa Miami, Ritella sent Zanghi an equipment purchase agreement that he helped forge that purported to show $165,000 in equipment purchases made by La Rossa Miami that allegedly never occurred.   (FAC ¶¶ 136, 144-49, 153.)   Based on the allegations that Ritella intentionally forged this counterfeit document and obviously knew, as the Managing Member of the La Rossa Miami with control over its operations, that the transaction never happened, the Complaint pleads a strong inference that Ritella deliberately acted with the intent to defraud Zanghi.

Additionally, we find that the Complaint adequately pleads Ritella's scienter with respect to the lone illustrative example that defendants brief in presenting their securities fraud arguments.  That alleged misstatement, which is contained in the La Rossa business plan prepared by Ritella, Cavallaro, and SL Cavallaro, stated that the initial capital investment in La Rossa

> has been put to work in two main areas:
> The renovation and opening of the first
> restaurant on Lafayette Street; [and t]he
> creation and building of the La Rossa
> brand along with public relations and
> social media campaigns to support the

> future growth of the business into other
> States.

(FAC ¶¶ 86, 90.)  According to the Complaint, this statement was materially misleading because 65% of the capital investment had actually been spent on rent.  (Id. ¶ 91.)

Defendants argue that the Complaint fails to allege a strong inference of scienter related to this statement because it would require us to accept that the defendants responsible for the statement "knew at the time of making the statement that [they were] being misleading" as opposed to "assuming that Plaintiff, a business owner in Rome, Italy, would expect a material portion of any business capital to go to commercial rent."  (Mot. at 26.)

We have no difficulty concluding that the statement was misleading and that Ritella knew it was misleading, as the phrase "main areas" of investment clearly implies that a majority of La Rossa's capital was spent on expenses other than rent when over 65% of that capital went towards La Rossa's rent, something that Ritella must have known as La Rossa's largest investor and managing member in charge of its operations (FAC ¶¶ 21, 87).  These allegations therefore establish a strong inference of scienter through conscious misbehavior or recklessness when compared to the innocent, yet far-fetched inference that Ritella was somehow unaware

that the majority of La Rossa's investment funds were not being used to pay rent.[16]

### C.   Cavallaro and SL Cavallaro

The Complaint alleges that Cavallaro was involved in the planning and development of La Rossa's projects in the United States and that he also helped draft the La Rossa business plan that he presented to Zanghi.  (Id. ¶¶ 45, 79, 86.)  Among the other alleged misstatements contained in the business plan is the representation that La Rossa New York was "initially funded with $360,000 of equity" when, at the time Cavallaro sent Zanghi the La Rossa business plan, the total investment was less than $285,000.  (Id. ¶¶ 87-88.)  The Complaint further alleges that Cavallaro knew about this misrepresentation and nonetheless disseminated the business plan to induce Zanghi's investment in La Rossa.  (Id. ¶ 86.)

Given Cavallaro's role in the initial planning and development of La Rossa's projects in the United States and his involvement in drafting the business plan describing La Rossa's finances, it is reasonable to conclude that Cavallaro either knew of or had access to information about La Rossa's

---

[16]    We find the allegations of scienter with respect to this alleged misrepresentation deficient as to Cavallaro and SL Cavallaro, as the Complaint does not present a sufficient basis to conclude that these defendants would have had knowledge of exactly how La Rossa's initial capital investment had been spent.  Critically, unlike with Ritella, there is no allegation that Cavallaro or SL Cavallaro managed La Rossa's day-to-day operations or controlled its capital expenditures.

initial capital funding.  This, in turn, presents a strong inference that Cavallaro was at least reckless in helping to prepare the business plan that allegedly overstated La Rossa's initial funding by $75,000.  This inference is at least as compelling as the competing inference that Cavallaro lacked access to information about La Rossa's finances or was simply mistaken about the true state of those finances when he was putting the business plan together.

Moreover, the allegations suggest that Cavallaro had a motive and opportunity to defraud Zanghi by presenting materially false information in the business plan, as he was incentivized by the prospect of receiving a commission for his recruitment of Zanghi as an investor in the La Rossa restaurants (id. ¶¶ 172-73, 277, 280) and had the means to commit the fraud by virtue of the trusted relationship he had developed with Zanghi and his knowledge that Zanghi was an interested potential investor in La Rossa (id. ¶¶ 47-49, 56-58).

Accordingly, the Complaint pleads a strong inference of scienter as to Cavallaro with respect to this misstatement. Furthermore, as the Complaint alleges that Cavallaro was acting in his capacity as an attorney at the law firm that bears his name in connection with preparing the allegedly misleading business plan and presenting it to Zanghi (see id.

-35-

¶¶ 56, 70-71, 86), his scienter may be imputed to SL Cavallaro.  See Griffin v. McNiff, 744 F. Supp. 1237, 1247 (S.D.N.Y. 1990), aff'd, 996 F.2d 303 (2d Cir. 1993) (finding that the scienter of a sufficiently senior attorney may be imputed to his law firm when the law firm was involved in preparing the allegedly misleading statement) (citation omitted).

### D.   Vacca

Regarding the Italian restaurateur Vacca, the complaint alleges that he was responsible, at least in part, for:

> (1) causing the money that Zanghi had already invested in relation to the Giotto deal to be used in a manner inconsistent with the representations made to Zanghi by Ritella (FAC ¶¶ 139, 174, 218-224); and

> (2) helping prepare the forged La Rossa Miami equipment purchase agreement, which is alleged on information and belief (id. ¶ 150).

The misconduct described in the first category is not actionable because it involves alleged actions taken by Vacca after plaintiffs made their investments and thus does constitute fraud in connection with the purchase or sale of securities.  See Solow v. Citigroup, Inc., 827 F. Supp. 2d 280, 287 n.2 (S.D.N.Y. 2011); Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 639 (S.D.N.Y. 2004).  Critically, there is no basis to conclude from the Complaint that Vacca played

any role in misrepresenting to Zanghi how his investment funds related to the Giotto deal would be used.[17]

With respect to the forgery, the Complaint only alleges Vacca's involvement in creating the forged purchased agreement on information and belief and otherwise fails to state with particularity the facts upon which that belief is formed. This allegation therefore cannot satisfy the PSLRA's requirement for pleading allegations of securities fraud on the basis of information and belief.

Accordingly, the Complaint does not adequately plead a Section 10(b) and Rule 10b-5 claim against Vacca with respect to the La Rossa transactions.

### E.   Alocci

Finally, as for Alocci, the Complaint alleges that he was involved in the following conduct:

> (1) drafting purchase agreements for the rights to Callegari's proprietary pizza-making method, which involved 200-year-old sourdough starter that was allegedly imported into the United States in violation of, <u>inter alia</u>, the Bioterrorism Act (FAC ¶¶ 37, 272);
>
> (2) failing to disclose to Zanghi certain title issues regarding the La Rossa New York membership interests (<u>id.</u> ¶ 193); and

---

[17]    The Complaint obliquely alleges that Vacca "promoted Zanghi's investment in the Giotto deal to induce Zanghi to pay $60,000" (FAC ¶ 226) but does not specify the contents of the alleged "promot[ion]," and thus this allegation plainly fails to meet the PSLRA's requirement to "specify . . . the reason or reasons why [an alleged misstatement] is misleading," 15 U.S.C. § 78u-4(b)(1)(B).

(3) reviewing, drafting, and transmitting the La Rossa Contracts on Zanghi's behalf (id. ¶¶ 41, 164, 220).

To start, while Alocci may have worked on the purchase agreement to sell Callegari's method to the United States, it does not follow from Alocci's involvement in drafting that transactional document that he knew that Callegari's sourdough starter would be imported illegally into the United States.  To the extent that plaintiffs contend that Alocci should have known that the sourdough starter would be imported illegally, that argument is descriptive of negligence, which cannot meet the strict standard for pleading scienter under the federal securities laws.  See Obus, 693 F.3d at 286.

Likewise, the allegation that Alocci was aware of and failed to disclose to Zanghi certain title issues with the La Rossa New York membership interests is conclusory and does not set forth the factual basis upon which Alocci either knew of or recklessly disregarded information about the alleged title issues.  Insofar as the Complaint asserts that Alocci should have known about these title issues had he performed a more thorough review of the La Rossa transactions, that, again, merely describes negligence.  See id.; Menora Mivtachim Ins. Ltd., 2021 WL 1199035, at *26 (listing cases).

Lastly, with respect to Alocci's involvement in drafting, reviewing, and transmitting the La Rossa Contracts,

there is no allegation that Alocci made any material misrepresentation to Zanghi related to those Contracts or that he otherwise misled Zanghi by failing to disclose material information about La Rossa of which Alocci was aware.

Thus, the Complaint fails to state a securities fraud claim against Alocci related Zanghi's purchases of the La Rossa membership interests.

### III. RICO Claims

Defendants next move to dismiss plaintiffs' civil RICO claims, which allege that defendants engaged in and conspired to engage in a pattern of illegal activity in violation of 18 U.S.C. §§ 1962(c) and (d).  Among the predicate acts alleged, the Complaint asserts that defendants induced Zanghi's investment in La Rossa by sending material misrepresentations by wire in violation of 18 U.S.C. § 1343.  (See, e.g., FAC ¶¶ 273, 274, 279.)

While defendants raise several arguments in support of dismissing plaintiffs' civil RICO claims, we need only focus on one: the PSLRA's bar on civil RICO claims predicated on conduct that would be actionable as securities fraud.  In relevant part, Section 1964(c) of the RICO statute, as amended by the PSLRA, provides in relevant part:

> Any person injured in his business or property by reason of a violation of [18 U.S.C. § 1962] may sue therefor in any

> appropriate United States district court
> . . . , <u>except that no person may rely</u>
> <u>upon any conduct that would have been</u>
> <u>actionable as fraud in the purchase or</u>
> <u>sale of securities to establish a</u>
> <u>violation of section 1962.</u>

18 U.S.C. § 1964(c) (emphasis added).

Plaintiff raises two counterarguments to avoid application of the PSLRA bar: (1) defendants have not established that the limited membership interests in the La Rossa entities acquired by plaintiffs qualify as securities; and (2) even if the PSLRA bar did apply to some alleged predicate acts, the Complaint identifies other predicate acts that are not related to the purchase of sale of the La Rossa membership interests.  As explained below, both arguments fail.

### A.   Whether the Membership Interests are Securities

Plaintiffs' argument that the membership interests in the La Rossa entities that they purchased are not securities is meritless.  We start by noting that the Complaint asserts several securities claims based on plaintiffs' purchase of those membership interests and even directly alleges that those purchases "constitute sales of securities within the meaning of 15 U.S.C. § 77b(a)(1), (3)."  (FAC ¶ 236.)  And, while we need not accept this legal conclusion as true, the La Rossa membership interests meet the definition of an

investment contract under the seminal framework set out by S.E.C. v. W.J. Howey Co., 328 U.S. 293 (1946).

To qualify as a security under the Howey test, the underlying transaction must involve the "[1] investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." Id. at 301.

Here, there is no dispute that plaintiffs' purchases of membership interest in the various La Rossa limited liability companies were investments of money in a common enterprise. Thus, the sole issue is whether the membership interests purchased by plaintiffs meet Howey's third prong.

As explained by the Second Circuit, the term "solely" in Howey's third prong is not to be "construed as a literal limitation." United States v. Leonard, 529 F.3d 83, 88 (2d Cir. 2008) (citation omitted). Rather, that condition is satisfied, inter alia, when "the scheme was being promoted primarily as an investment," id., or as a means to derive "a reasonable expectation of profits . . . from the entrepreneurial or managerial efforts of others," United Hous. Found., Inc. v. Forman, 421 U.S. 837, 852 (1975). Thus, the third prong concerns whether the investor possessed a reasonable expectation of significant control over the company through his investment. See Leonard, 529 F.3d at 88.

Limited liability company membership interests can satisfy _Howey_'s third prong "when the [members] are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control." _See_ _Gilmore v. Gilmore_, No. 09 Civ. 6230 (WHP), 2011 WL 3874880, at *5 (S.D.N.Y. Sept. 1, 2011), _aff'd_, 503 F. App'x 97 (2d Cir. 2012) (citing _Nelson v. Stahl_, 173 F. Supp. 2d 153, 164 (S.D.N.Y. 2001)).  The case law accordingly draws a key distinction between purchases of membership interests in which the purchaser acquires a substantial amount of management rights, such as the authority to control the company and make managerial decisions, and purchases of membership interests in which the purchaser acquires only limited powers and the authority to control the company and handle managerial duties is vested in another entity.  _See id._ at *5-6 (citing _Nelson_, 173 F. Supp. 2d at 166).  The latter scenario demonstrates that the purchaser expects to rely on the efforts of others to generate a profit from his investment.  _See id._ at *5.

While in some cases it be appropriate to reserve the determination of whether limited liability company membership interests meet _Howey_'s third prong for a later stage of the litigation when the parties raise potential factual disputes about control and investor expectations, here, accepting

plaintiffs' allegations in the Complaint as true, these issues are not reasonably in dispute.  That is because, as the Complaint alleges, the membership interests in the La Rossa entities purchased by plaintiffs only entitled them to become "Limited Members" with "no authority to bind the companies with respect to any matter." (FAC ¶ 22.)  Moreover, the Complaint alleges that Futura was the "Managing Member" of the La Rossa entities and that Futura and its managing member, Ritella, retained the "exclusive right to manage, control, or conduct the business and affairs" of the La Rossa companies.  (Id. ¶ 21.)  Accordingly, plaintiffs reasonably expected to profit from the managerial efforts of others, and the La Rossa limited membership interests they purchased therefore qualify as securities under the Howey test.

## B.   Application of the PSLRA Bar

Having concluded that the La Rossa membership interests purchased by plaintiffs are securities, we next consider plaintiffs' argument that their RICO claims should survive dismissal because the Complaint alleges predicate acts that do not constitute securities fraud.  It is, however, indisputable that some of the predicate acts alleged, if proven, would qualify as securities fraud, given that Complaint alleges that defendants violated 18 U.S.C. § 1343 by using wires in connection with making material

-43-

misrepresentations to Zanghi to induce his investments in La Rossa.  (See, e.g., FAC ¶¶ 273, 274, 279.)

As this Court and several sister courts in this Circuit have held, if a complaint alleges that a RICO enterprise is engaged in a single scheme of racketeering activity, then when "any predicate act is barred by the PSLRA it is fatal to the entire RICO claim."  In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666, 730 (S.D.N.Y. 2013), vacated on other grounds sub nom. Gelboim v. Bank of America Corp., 823 F.3d 759 (2d Cir. 2016) (internal quotation marks and citation omitted); see Gilmore v. Gilmore, 503 F. App'x 97, 99-100 (2d Cir. 2012) (summary order) (affirming holding that PSLRA barred all RICO claims as part of a single scheme that included predicate acts that would constitute securities fraud).[18]

---

[18]    Accord, e.g., Great W. Ins. Co. v. Graham, No. 18 Civ. 6249 (VSB), 2020 WL 3415026, at *37 (S.D.N.Y. June 22, 2020) ("Where plaintiffs allege a single scheme, courts have held that if any predicate act is barred by the PSLRA it is fatal to the entire RICO claim.") (citation and internal quotation marks omitted); EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd., No. 18 Civ. 1047 (PGG), 2020 WL 2319127, at *9 (S.D.N.Y. May 11, 2020) (Where "the PSLRA bar applies to the predicate acts of wire fraud" and the "wire fraud, Travel Act, and money laundering predicate acts are all part of the same claim," then "the entire RICO conspiracy claim is barred.") (citations omitted); Awad v. Omar, No. 18 Civ. 10810 (NRB), 2019 WL 5727327, at *4-5 (S.D.N.Y. Nov. 5, 2019) (where a predicate act qualifies as securities fraud, the PSLRA "bars plaintiffs' RICO claim, and does so regardless of whether the other predicate acts that plaintiffs allege are based on conduct that is not actionable as securities fraud") (citation omitted); Ling v. Deutsche Bank, No. 04 Civ. 4566(HB), 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005) ("If one predicate act alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the PSLRA bar.").

Here, the PSLRA bar requires the full dismissal of plaintiffs' civil RICO claims because the Complaint alleges some predicate acts that would be actionable as securities fraud and further alleges that defendants committed the predicate acts "through and by the RICO Enterprise . . . as part of the same overarching scheme of preparing and disseminating forged and false documents to defraud Zanghi" with the "similar purpose" of "profit[ing] from the fraudulent recruitment of investors in Roman-styled pizzerias" (FAC ¶¶ 269, 296 (emphasis added)).

## IV.   Supplemental Jurisdiction

Defendants' final argument is that we should decline to exercise supplemental jurisdiction over plaintiffs' common law claims arising under state law because the Complaint fails to sufficiently plead a federal claim.  This argument is facially deficient because defendants failed to move for dismissal of plaintiffs' securities claims arising under Sections 12(a)(1) and 12(a)(2) of the Securities Act of 1933. Moreover, as discussed above, we find that plaintiffs have adequately alleged claims for securities fraud in violation of Section 10(b) and Rule 10b-5.

As it appears that plaintiffs' state law claims arise out of the same common nucleus of operative fact as the federal claims, the Court has supplemental jurisdiction over

those claims under 28 U.S.C. § 1367(a).  See Montefiore Med.
Ctr. v. Teamsters Loc. 272, 642 F.3d 321, 332 (2d Cir. 2011)
(citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715,
725 (1966)).

## CONCLUSION

For the reasons stated above, defendants' motion to
dismiss is granted in part and denied in part.

With respect to forum non conveniens, we will exercise
our discretion to retain jurisdiction over plaintiffs' claims
related to the La Rossa transactions.  However, plaintiffs'
claims related to the Sforno transaction are dismissed
without prejudice so that plaintiffs may pursue those claims
in Italy.  That dismissal is subject to defendants submitting
the stipulation described above within 30 days of this Order.

Defendants' motion to dismiss plaintiffs' Section 10(b)
and Rule 10b-5 securities fraud claims arising from the La
Rossa transactions against Vacca and Alocci is granted.  Those
claims are dismissed with prejudice.  The motion to dismiss
plaintiffs' Section 10(b) and Rule 10b-5 securities fraud
claims against Ritella, Cavallaro, and SL Cavallaro related
to the La Rossa transactions is denied.

The Court grants defendants' motion to dismiss the civil
RICO claims with prejudice.

Finally, because the Court has supplemental jurisdiction over plaintiffs' state law claims, defendants' motion to dismiss those claims is denied.

The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 139.

**SO ORDERED.**

Dated:   New York, New York
         September 24, 2021

_____
         NAOMI REICE BUCHWALD
         UNITED STATES DISTRICT JUDGE